**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Douglas Kevin Kelly, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | Case No. 1:07-cv-068 |
| Bucyrus International, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

Defendant has moved for summary judgment, which is resisted by the Plaintiff. For the reasons set forth below, defendant's motion is denied.

**I.   BACKGROUND**

Pursuant to a purchase agreement dated August 13, 2002, BNI Coal, Ltd. (BNI) contracted with Bucyrus International, Inc. (Bucyrus) for the manufacture of a large dragline for use at BNI's mine near Center, North Dakota. Because there is no way to transport mining equipment of this size any distance, the manufacturer must fabricate the dragline in pieces and ship them to a point near where the dragline is going to be used for assembly and erection, which is sometimes done by a third party. In this case, at the same time that BNI contracted with Bucyrus for the manufacture of the dragline, it entered into a separate erection agreement with Minserco, Inc. (Minserco), a subsidiary of Bucyrus, for its assembly and erection.

On September 14, 2004, plaintiff, an employee of Minserco, suffered a head injury while working on the erection of the dragline. In this action, plaintiff sues Bucyrus claiming it was at fault for his injuries. Under North Dakota's worker's compensation laws, plaintiff is prohibited from suing his employer, Minserco.

1

A few days prior to the accident, an electrical problem affecting the operation of the "drag drum" was discovered. The "drag drum" is a large drum located in the house of the dragline that is used for spooling two large-diameter steel cables used in the operation of the dragline. The only way to fix the electrical problem was to remove the cable that had already been spooled around the drum so that it could be rotated in a free state.

When the dragline is operational with its boom raised, the two cables that spool around the "drag drum" are commonly referred to as the "drag ropes" or "draglines." Prior to the operation of the dragline, these cables are also used to raise the boom and when used for that purpose are often referred to as the "raising" ropes or lines. Since the boom had not been raised at the time of the accident, the cables will be referred to as the "raising ropes," which is the terminology used by most of the witnesses in their deposition testimony.

The first step that was taken to remove the raising rope from the drag drum was to lower the sheaves in the derrick through which the remainder of the raising rope had been threaded. This resulted in most of the raising rope spooled on the drag drum to be pulled off by gravity, leaving about one to two turns of rope that still had to be removed from the drum.

To remove the remainder of the rope, the plan was to create slack in the rope by rotating the drum and at the same time using two "tugger winches," which were permanently located at the rear of the dragline house, to pull the rope off the drum. And, to winch the raising rope off, those involved ran two smaller diameter cables from the tugger winches and affixed one to each end of the raising ropes at a point near where they were attached to the drag drum using nylon slings to make the connection. There is some evidence that nylon slings were used in lieu of metal chains or slings to protect the raising ropes from being damaged.

After the winches were engaged placing tension on the winch lines and the slings, but before the drum was rotated, one of the slings separated and failed. This, in turn, caused the end of the winch cable to which the failed sling had been attached to rebound and strike plaintiff in the head. One explanation for the cause of the sling's failure is that it came in contact with a bolt on the drag drum as tension was being applied to the winch cable and sling and that the contact with the edges of the bolt caused the sling to first tear and then separate as it lost its holding capacity. It is not clear from what the parties have submitted whether other causes will be advanced for the sling's failure.

Plaintiff was Minserco's "lead man" for rigging - a role that appears to be the equivalent of a crew foreman. Because of the head injury that plaintiff sustained, he is unable to recall the accident and what he was doing immediately prior to it. Consequently, plaintiff's proof as to what happened is primarily dependent upon the accounts of others. And, there appear to be significant differences in the accounts that have been given.

Some of the witnesses have testified that one of plaintiff's rigging crew made the initial connections between the winch lines and the raising ropes and that plaintiff later inspected the connections and made changes. According to the accounts of these witnesses, plaintiff then positioned himself beneath another drum a short distance from the drag drum where he could observe the drag drum, give signals to the winch operator to control the winching activity, and to give signals to Joe Doherty, a Bucyrus field engineer, for the operation of the drum. By all accounts, Doherty was standing nearby in front of a camera and that he was to in turn signal the dragline operator controlling the drum who was not able himself to see the work being done.

On the other hand, there is another Minserco lead man who has given a statement to the effect that plaintiff was with him doing other things and that just prior to the accident he and plaintiff

went to the dragline house floor and were surprised to see that plaintiff's rigging crew had already rigged the winch cables to the raising ropes under the supervision of Joe Doherty. According to this witness, the effort to remove the raising ropes was already underway and it was almost immediately upon their arrival that the winch cable suddenly recoiled and struck plaintiff in the head. If this account is be believed, plaintiff had little or no involvement with the rigging that was done leading up to the accident.

Aside from the differing accounts as to what plaintiff's role actually was, there also appears to be disputes over who was in charge of the work that was being performed. Bucyrus takes the position that Minserco was solely responsible for the erection of the dragline and the work being performed. Bucyrus argues that plaintiff, a Minserco employee, was solely responsible for the rigging of the winch lines to the raising rope and for deciding whether or not it was proper for him to be in the position where he was located at the time of the accident.

Plaintiff disagrees. He argues that all of the work at the erection site was being supervised and managed by Bucyrus, including the task of removing the raising rope from the drag drum so that the necessary electrical repairs could be made. To support this argument, plaintiff points to the evidence that field engineer Joe Doherty, a Bucyrus employee, had been sent out to the project site by Bucyrus to help get the dragline erection back on schedule and that, in undertaking this effort, he would from time-to-time actively direct the work, including the removal of the raising rope from the drag drum. Plaintiff also points to the evidence suggesting that it was Bucyrus who contracted for the services of Gary Regynski, the project manager for the dragline erection, and that both Regynski and Doherty reported to a person who allegedly was part of the Bucyrus chain-of-command.

## II.      DISCUSSION

Bucyrus advances several arguments for why this case should be dismissed. The court will address them in the order presented.

### A.      Argument that Bucyrus owed no duty to the plaintiff

Bucyrus argues that the erection of the dragline was solely Minserco's responsibility,[1] including the rigging of the winch cables to the raising ropes so they could be removed from drag drum and the necessary electric fixes made. In anticipation of plaintiff's argument that Doherty's conduct was sufficient to create a duty, Bucyrus acknowledges that Doherty was present, but characterizes him as a passive observer in terms of the rigging of the winch cables to the raising rope, arguing this was solely the responsibility of plaintiff and his crew.

In making this argument, however, Bucyrus ignores the facts favorable to plaintiff. As already noted, there is evidence which suggests that Doherty undertook the supervision of the overall task of removing the raising ropes from the drag drum and that plaintiff and others were following his direction in terms of how that task was to be accomplished. At the very least, an affirmative undertaking of this kind creates a duty to exercise due care, including not exposing those being supervised to unreasonable risks of harm. See, e.g., Madler v. McKenzie County, 467 N.W.2d 709, 714-715 (N.D. 1991); Patch v. Sebelius, 349 N.W.2d 637, 641-643 (N.D. 1984); N.D.C.C. §§ 9-10-01, 9-10-06; see generally Restatement (Second) of Torts § 324A (1965). And,

---

[1] In making the argument that the erection of the dragline was solely Minserco's responsibility, Bucyrus relies primarily upon the contract between BNI and Minserco for the erection of the dragline. However, BNI in its purchase agreement with Bucyrus contracted for more than simply the supply of the component parts of the dragline. Exhibit B to the purchase agreement defines Bucyrus's scope of work and includes, among other things, the following:
   G.      Supply of technical supervisory personnel during engineering, design, manufacture, *erection*,
           testing, initial start-up and initial operation of the Dragline.
(emphasis added).

here plaintiff's safety expert has opined that a number of unsafe acts and practices took place during the attempted removal of the raising ropes.[2]

Plaintiff makes other arguments for why Bucyrus owed a duty, including that it was overall in charge of the dragline's erection and that Minserco was essentially providing only labor and crew foremen. Also, Bucyrus has argued in its brief that no duties were created by either MSHA or OSHA. These issues need not be resolved now given the court's determination that some duty was owed if the jury resolves certain of the disputed facts in plaintiff's favor.[3]

### B.  Argument of no proximate cause

Normally, the issue of proximate cause is one for the jury. E.g., Miller v. Diamond Resources, Inc., 2005 ND 150, ¶ 18, 703 N.W.2d 316. However, it can be come an issue of law for the court if reasonable minds could reach only one conclusion. E.g., Kimball v. Landeis, 2002 ND 162, ¶ 7, 652 N.W.2d 330. Bucyrus argues this is the case here.

However, for many of the same reasons the court rejects Bucyrus's no-duty argument, it also rejects the lack of proximate cause argument. Among other things, plaintiff's safety expert has

---

[2] While the court need not make a final decision now, the following *may* be questions for the jury, assuming no material change in the disputed nature facts: whether the overall plan for removing the raising ropes, including the positioning of the persons involved, was reasonable in light of the risks to the safety of those involved; whether the use of the nylon slings was appropriate under the circumstances; whether it was reasonable to allow the rigging of the winch lines to the raising ropes at a point where the connections could not be observed; whether it was reasonable to rely upon plaintiff's crew to rig the winch lines to the raising ropes in a safe manner without any direction or further inspection; and whether it was reasonable to allow plaintiff to be in the position he was in at the time of he accident.

On the other hand, it is undisputed that plaintiff was the rigging foreman for the project and a very experienced rigger. As a consequence, the following *may* also be questions for the jury: whether plaintiff was involved in the rigging that failed; whether Doherty and others acted reasonably in relying upon plaintiff's experience; whether plaintiff was responsible, all or in part, for the deficiencies in the rigging and his positioning at the time of the accident; and whether plaintiff's fault, if any, was 50% or more of the total fault.

[3] Bucyrus argues that OSHA does not apply because MSHA's inspectors investigated the accident. While it may very well be that OSHA lacked jurisdiction over the erection activities, this is not proved simply by the fact that MSHA investigated the accident. See Chao v. Mallard Bay Drilling, Inc., 534 U.S. 235 (2002) (investigation by the Coast Guard was not alone sufficient to divest OSHA of jurisdiction).

opined that it was not appropriate to use the nylon slings - at least in the way they were used - because of their exposure to the sharp edges of the bolt. He also opines that it was not appropriate to allow plaintiff to be in the "zone of danger" at the time of the accident. If the jury agrees with either of these two points, they could reasonably conclude that one or both were substantial causes of plaintiff's injuries and find in his favor on the issue of proximate cause.

   **C.** **Argument that plaintiff's claims are barred by North Dakota's worker's compensation law**

Bucyrus argues that plaintiff's claims are barred by North Dakota's worker's compensation laws codified at N.D.C.C. Title 65. While somewhat difficult to follow, Bucyrus's argument appears to be essentially this: The erection of the dragline was solely the responsibility of Minserco. The only possible basis for arguing differently was the presence of Joe Doherty. But Doherty's presence did not change the fact this was solely a Minserco operation. This is because Doherty, even though he was on Bucyrus's payroll, should be considered a "loaned servant" working for Minserco, and, as a consequence, Bucyrus should be accorded the same immunity from suit as Minserco.

There are a number of problems with this argument. First, as already discussed, there is evidence which suggests that the erection of the dragline was not solely the responsibility and work of Minserco.

Second, Bucyrus has failed to come forward with sufficient uncontested facts from which the court could conclude that Doherty was a "loaned servant" as a matter of law under the authority cited by Bucyrus. See Lundstrom v. Maguire Tank, Inc., 509 F.3d 864, 868-869 (8th Cir. 2007); Pechtl v. Conoco, Inc., 1997 ND 161, ¶¶ 24-26, 67 N.W.2d 813. In particular, Bucyrus has failed to demonstrate that the only reasonable conclusion a jury could reach is that Doherty's work was subject to the control of Minserco at the time of the accident, which is a necessary element that must

be proved under the authority cited by Bucyrus.  Id.

Third, in North Dakota, the issue of whether a "contributing employer" should be afforded immunity from suit is controlled by statute.  Cervantes v. Drayton Foods, L.L.C., 1998 ND 138, ¶¶ 8-12, 582 N.W.2d 2.  Consequently, the Eighth Circuit case cited by Bucyrus of Lundstrom v. Maguire Tank, Inc., supra, is not on point since it was based on Minnesota law that is materially different from North Dakota's.  See Trinity Hospitals v. Mattson, 2006 ND 231, ¶¶ 9-21, 723 N.W.2d 684; Cervantes v. Drayton Foods, L.L.C., supra.

Fourth, while it appears that the only argument made by Bucyrus for Title 65 immunity is that set forth above, proof that Minserco was a wholly owned subsidiary of Bucyrus is not itself sufficient to demonstrate an entitlement to immunity under North Dakota's statutory scheme for providing worker's compensation.  See Trinity Hospitals v. Mattson, supra; Cervantes v. Drayton Foods, L.L.C., supra.

In summary, Bucyrus has failed to establish sufficient uncontested facts to demonstrate an entitlement to immunity under N.D.C.C. Title 65.

**III.   ORDER**

Based upon the foregoing, defendant's motion for summary judgment (Doc. No. 17) is **DENIED**.

Dated this 27th day of January, 2009.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge